

May 12, 2022

Hon. P. Kevin Castel
United States District Court for the Southern District of New York
500 Pearl Street
New York, New York 10007

By Electronic Filing.

  **Re:** Case No. 21-cv-10839, <u>Margolies v City of New York, et al</u>.

Dear Judge Castel:

   My firm, along with Gideon Oliver, represents Plaintiff in the case named above. Consistent with the Court's Individual Practices, we write in response to the Court's Order at Dkt. No. 21. While Plaintiff had intended to convey she did not intend to amend the complaint in response to the motion proposed, given the Court's Order, we are submitting a proposed amendment — and because of the simplicity of that amendment, a proposed amended complaint is included herewith.

   With that said, we do want to emphasize again that Defendants' latest letter seems to reflect counsel totally refusing to meaningfully engage with either the complaint or the "text of the curfew order" — which, using a mandatory "shall," "explicitly required" a dispersal order before any arrest. *In re N.Y.C. Policing During Summer 2020 Demonstrations*, No. 20-cv-8924 (CM)(GWG), 2021 U.S. Dist. LEXIS 128437, at *46-47 (S.D.N.Y. July 9, 2021) ("*In re Policing*"). That said, the details of that refusal may change in the next round of letters (or perhaps an answer) — Defendants may choose to actually explain how they think, for example, they get to ignore that the complaint specifies that no orders to disperse was given. But that is for another day at this point.

   For now, Plaintiff asks the Court's permission to amend as shown in the attached proposed complaint, which adds a handful of allegations explaining that the policy of arresting protest support workers like legal observers came from the top of the NYPD.

   We thank the Court for its time and consideration.

Leave to file Second Amended Complaint is GRANTED.
File within five days. Defendants may move against the Second
Amended Complaint within 21 days after filing. Plaintiff shall
respond within 21 days after the filing of defendant's motion and
defendants may reply within 10 days of the filing of plaintiff's
response to the motion.

SO ORDERED.
Dated: New York, NY
5/12/2022

P. Kevin Castel
**United States District Judge**

cc:
All relevant parties by ECF.

Respectfully submitted,

/s/
_____

J. Remy Green
 *Honorific/Pronouns: Mx., they/their/them*
**COHEN&GREEN P.L.L.C.**
1639 Centre St., Suite 216
Ridgewood, New York 11385

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------X
REBECCA MARGOLIES,

|  |  |
|---|---|
| Plaintiff, | **SECOND AMENDED COMPLAINT** |
| -against- | |
| THE CITY OF NEW YORK; MAYOR BILL DE BLASIO; NEW YORK CITY POLICE DEPARTMENT ("NYPD") COMMISSIONER DERMOT SHEA; NYPD CHIEF OF DEPARTMENT TERENCE MONAHAN; NYPD OFFICER FIRST NAME UNKNOWN (FNU) DESTEFANO; and NYPD MEMBERS JOHN AND JANE DOES 1-29, | **21-cv-10839 (PKC)** |
| Defendants. | |

-------------------------------------------------------------------------------X

Plaintiff, REBECCA MARGOLIES, by her attorney, COHEN&GREEN P.L.L.C. and

Gideon Orion Oliver, hereby complain of Defendants as follows:

## PARTIES, VENUE, AND JURISDICTION

1.      At all times mentioned herein, Plaintiff, REBECCA MARGOLIES (Ms. Margolies;

she/her) was a resident of Kings County in the City and State of New York.

2.      At all relevant times mentioned herein, Defendant, City of New York ("New York

City"), was and is a municipal corporation duly organized and existing under and by virtue of the

laws of the State of New York and acts by and through its agencies, employees and agents,

including, but not limited to, the New York City Police Department ("NYPD"), and their

employees.

3.      Defendant New York City Mayor BILL DE BLASIO was at all times relevant to

this Complaint, and still is, the Mayor of New York City. As Mayor, Defendant de Blasio, at all

relevant times, was and is an elected officer and the "chief executive officer of the city," NYC

Charter Section 3, and had final authority to appoint and/or remove the New York City Police Commissioner. He is sued individually and in his official capacity.

4.      Defendant NYPD Commissioner DERMOT SHEA was at all times relevant to this Complaint, and still is, the Police Commissioner of the NYPD. As Police Commissioner, Defendant Shea, personally and/or through his authorized delegates, at all relevant times had final authority to promulgate and implement administrative and managerial policies and procedures, including policies and procedures as to personnel hiring, training, supervision, and discipline with respect to NYPD officers' performance of their duties, and constituted a City policymaker for whom the City is liable. He is sued individually and in his official capacity.

5.      Defendant NYPD Chief of Department TERENCE MONAHAN was at all times relevant to this Complaint the Chief of Department of the NYPD who has policymaking authority over the Department. At all relevant times, as Chief of Department, Defendant Monahan, had primary responsibility for NYPD operations—that is, for the police response on the street. Within the paramilitary structure of the NYPD, all NYPD uniformed members of the service were obligated to obey any lawful order given by him. He is sued individually and in his official capacity.

6.      Defendant NYPD Officer First Name Unknown ("FNU") DeStefano (Tax I.D. # 954927), and John and Jane Does 1-29 are collectively referred to herein as the "Margolies Defendants." Plaintiff does not currently know the names of the Doe Defendants, but their names are known to the Defendants. Jane Doe 1 appeared to be a Latina woman in a blue NYPD uniform. Does 2-29 wore NYPD uniforms.  At least one of Does 2-29 wore a white shirt NYPD uniform.

7.       The Margolies Defendants are sued herein in their official and individual capacities.

8. The Margolies Defendants are NYPD members who unlawfully used excessive force, arrested, and/or detained Plaintiff and others similarly situated in violation of their constitutional rights.

9. At all times hereinafter mentioned, the Defendants were employed by the City of New York as members of the NYPD. Some of their true names, as noted throughout this Complaint, are currently unknown to the Plaintiff.

10. At all times hereinafter mentioned, Defendants, either personally or through their employees, were acting under color of state law and/or in compliance with the official rules, regulations, laws, statutes, customs, usages and/or practices of the State or City of New York.

11. Each and all of the acts and omissions of the Defendants alleged herein occurred while said Defendants were acting within the scope of their employment by the Defendant City.

12. Defendants were duly appointed and acting officers, servants, employees, and agents of Defendant City who were acting for, and on behalf of, and with the power and authority vested in them by Defendant City, and were otherwise performing and engaging in conduct incidental to the performance of their lawful functions in the course of their duties.

13. Defendants were each and all responsible, in whole and/or in part, for the planning for and/or creation, promulgation, implementation, and/or enforcement of the unconstitutional policies, practices and/or customs complained of herein, and/or condoned, acquiesced in, adopted, and/or approved of the same, through their acts and/or failures to act, as set forth more fully below.

14. At all times relevant herein, as set forth more fully below, Defendants' actions and/or failures to act were malicious, intentional, knowing, and/or with a deliberate indifference to or a reckless regard for the natural and probable consequences of their acts and/or omissions.

15.     Although there was a reasonable opportunity to do so, at no time did any of the Defendants, or any other member of the NYPD, take any steps to intervene in, prevent, or otherwise limit the unconstitutional conduct engaged in by their fellow officers.

16.     Venue is properly laid in the Supreme Court of the State of New York, Bronx County, including because the Plaintiff's claims arose there.

17.     Plaintiff has been damaged in a sum that exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction.

18.     Plaintiff timely served Notices of Claim on the municipal Defendant and complied with all conditions precedent to commencing an action under state law.

19.     At least thirty days have elapsed since service of Plaintiff's Notice of Claim and adjustment and payment thereof has been neglected or refused.

20.     This action has been initiated within one year and ninety days of the accrual of Plaintiff's claims pursuant to New York State Law.

21.     Plaintiff initially commenced this matter as an action in Bronx County Supreme Court, where venue was proper, *inter alia,* because the causes of action all arose within Bronx County.

22.     Some of the Defendants then removed the proceeding to the Southern District of New York pursuant to 28 U.S.C. § 1441 because the Court has original jurisdiction over Plaintiff's 42 U.S.C. §§ 1983 and 1988 claims pursuant to 28 U.S.C. §§ 1331 and 1343.

23.     This Court has supplemental jurisdiction over Plaintiff's New York law-based claims under 28 U.S.C. § 1367.

## STATEMENT OF FACTS[1]

### THE SUMMER 2020 PROTESTS IN SUPPORT OF BLACK LIVES

24.     On May 25, 2020, police killed George Floyd. Almost immediately, protests against police violence and in support of police accountability and the Black Lives Matter movement spread across the United States and the world, including here in New York City where thousands exercised their constitutional rights to protest.

25.     In the days and weeks following Floyd's killing, the New York City Police Department ("NYPD") engaged in activities that violated the constitutional rights of individuals who were protesting police misconduct, including, *inter alia,* corralling protestors into spaces where they could not escape, beating protestors with batons and fists, throwing protestors to the ground, using pepper spray indiscriminately, and ultimately arresting many of the protestors without lawful justification and without fair warning. Protestors were physically restrained with

---

[1] Many of the allegations below are provided not as policies that specifically harmed Plaintiff, but as context for the harm she suffered. That is, the totally lawless atmosphere fostered by Defendants during the summer of 2020 and beyond lead to Defendants' apparent total disregard for the vital legal function played by jail support volunteers — and the willingness to refuse to even *read* the letter and attestation demonstrating beyond doubt that Plaintiff was legally permitted to be out beyond curfew (in fact, because arrests often leave people without any ability to get home, it was only thanks to the tireless work of jail support volunteers like Plaintiff that protesters did not end up in an endless cycle of re-arrests because of NYPD's disregard for the warning/opportunity to disperse requirement in the curfew).

Consider, for example, while Plaintiff were not "kettled" personally, the routine use of the kettling tactic to generate supposed probable cause — and then malicious use of that supposed probable cause to brutalize protesters — made the officers who arrested Plaintiff feel emboldened to make a purely retaliatory arrest for Plaintiff's apparent First Amendment association with and provision of assistance to anti-police protesters. Similarly (but again, not exhaustively), that the top level of NYPD brass directed unlawful kettles prior to the curfew — that NYPD then used as supposed probable cause to arrest protesters after forcing them to stay out past the curfew (without providing any opportunity to disperse) — wrongly taught officers and supervisors that the curfew's requirement for an instruction and opportunity to disperse was optional. And that, in turn and in part, lead directly to Plaintiff's unlawful arrest.

Similarly to, and for total clarity, Plaintiff isn't making *any* claim based on the theory *she* was flex-cuffed. Rather, the policies and practices related to flex-cuffing are provided largely as background: there was an environment where, despite training that explicitly requires removal of flex-cuffs if anyone even *asks* — flex-cuffs are, by NYPD policy, only supposed to be used on cooperative arrestees — officers were told to leave flex-cuffs on even as arrestees' hands turned purple and as they screamed in pain.

tight handcuffs - often, but not exclusively, with plastic flex-cuffs - for excessively long period of time in such a manner that caused them unnecessary pain and suffering and, in some cases, possible serious and long-term nerve damage. They were also subjected to lengthy and unnecessary arrest processing that put them in dangerously close quarters, all at the height of the global COVID-19 pandemic.

26.     The unlawful policies and practices used by Defendants against protestors included a crowd-control tactic known as "kettling" to corral and detain individuals who were engaged in peaceful protest. Defendants used kettling and similar tactics in order to impede constitutionally protected First Amendment activities, to conduct mass arrests without probable cause, and to deter those arrested and beaten, and others, from exercising their First Amendment rights in the future.

27.     In addition, NYPD officers also targeted and arrested legal observers, medics, and other workers performing essential services without probable cause.

28.     By contrast, these same Defendants have responded to other protests (including, in particular, "Blue Lives Matter" and other pro-police protests) without using the same tactics employed against those who protested police conduct during the racial justice protests of 2020.

29.     The police actions in this case were part of overlapping policies and practices of the City of New York and the NYPD which were well known to Defendants New York City Mayor Bill de Blasio, New York City Police Commissioner Dermot Shea, and other City policymakers. These overlapping policies and practices include, *inter alia,* the use of excessive force, false arrests, and excessive and unreasonable detention at certain demonstrations—particularly those that focus on misconduct by the NYPD—but not others. These overlapping policies and practices have existed for years and have often resulted in litigation.

**THE COVID-19 PANDEMIC IN NEW YORK CITY**

30.     As protesters were taking to the streets in the summer of 2020 to speak out against police brutality and in support of Black lives, the COVID-19 virus raged across the country.

31.     In April 2020, Governor Cuomo ordered people to wear protective face masks in public, to protect themselves and others from the spread of the virus.

32.     However, many police officers failed to abide by this directive to wear masks. And many officers who interacted with and arrested protesters in May and June of 2020 were not wearing face masks, even as the City continued to record hundreds of new coronavirus cases each week. By contrast, most protesters wore protective face masks—at least until their contacts with NYPD members.

33.     During their arrests, some protesters masks fell off or were removed. These protesters were transported in vans and/or buses and placed in holding cells in close indoor contact with other arrestees whose masks fell off or were removed, and police officers who were not wearing masks.

## STATE AND CITY OFFICIAL REPORTS ON THE SUMMER 2020 PROTESTS RELIED ON BY PLAINTIFF, IN PART, IN SUPPORT OF PLAINTIFF'S MUNICIPAL LIABILITY CLAIMS

34.     In support of Plaintiff's municipal liability claims, in part, Plaintiff relies on the contents of certain reports referred to in this pleading, including the New York State and New York City agency reports below. including, *inter alia,* the report issued by the New York City Corporation Counsel and the report issued by the New York City Department of Investigation.[2]

---

[2] Margaret Garnett, Commissioner, New York City Department of Investigation, *Investigation into NYPD Response to the George Floyd Protests*, ("DOI Report"), Dec. 2020, available at https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf; New York City Law Department, *Corporation Counsel Report Pursuant to Executive Order 58 (June 20, 2020) Directing an Analysis of Factors Impacting the George Floyd Protests in New York City* (Dec. 2020) ("OCC Report"), https://www1.nyc.gov/assets/law/downloads/pdf/ProtestReport-np.pdf.

35.     In July 2020, the New York State Office of the Attorney General (the "AG") issued a preliminary report on the NYPD's response to the May and June protests ("AG Report").[3]

36.     The AG Report found that most complaints received by the AG were allegations of excessive force, kettling, false arrests, and excessive force against protestors as well as similar misconduct directed at the press, National Lawyers Guild – New York City Chapter Legal Observers, elected officials, and essential workers.

37.     The AG Report also found the pervasive failure of NYPD officers to wear protective face coverings to protect themselves and others against the spread of COVID-19.

38.     In December of 2020, the NYC Department of Investigation issued a report examining the NYPD's conduct in response to the 2020 Black Lives Matter protests ("DOI Report").

39.     The DOI Report found, *inter alia*, that the NYPD lacked a sufficiently tailored strategy to respond to protests, used force and tactics of crowd control that led to excessive force and "heightened tensions," made decisions based on intelligence that lacked "context or proportionality," and deployed officers who lacked sufficient training in responding to protests.[4]

40.     In addition to noting the heavy-handed response by the SRG at the 2020 protests, the DOI Report found that officers not from SRG lacked "any recent training related to protests."[5]

---

[3] New York State Office of the Attorney General, *Preliminary Report on the New York City Police Department's Response to the Demonstrations Following the Death of George Floyd*, ("AG Report"), July 2020, available at https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf.
[4] DOI Report at 36.
[5] *Id.* at 61.

8

41.     The DOI found that NYPD policies do not have specific First Amendment protest expression policing policies and failed to distinguish policies for serious civil disorders and riots from those applicable to peaceful First Amendment expression.

42.     The DOI distinguished between protest facilitation and protest control, regulation, or suppression.

43.     The former is preferred to allow for First Amendment expression, the DOI Report found, but the NYPD employed protest control during the 2020 protests.

44.     According to the DOI Report, between May 28 and June 5, 2020, approximately 2,047 individuals were arrested during demonstrations.[6]

45.     The DOI also found that Black arrestees were disproportionately charged with felonies.[7]

46.     The DOI also found that "the force required to carry out a mass arrest was disproportionate to the identified threat," and "placed the burden of potential crime on a wide swath of people who had no apparent connection to that potential criminal activity."[8]

47.     According to the DOI Report, between May 28 and June 20, 2020, the CCRB had received 1,646 protest-related allegations related to 248 incidents.[9]


**OTHER DOCUMENTS AND FACTS PLAINTIFF INCORPORATES BY REFERENCE**

48.     Plaintiff incorporates by reference the facts contained in the reports that have been issued concerning Defendants' responses to the summer 2020 protests, including, *inter alia,* the

---

[6] *Id.* at 26.
[7] *Id.* at 27.
[8] DOI Report at 56.
[9] *Id.* at 28.

report issued by the New York City Corporation Counsel and the report issued by the New York City Department of Investigation.[10]

49.     Plaintiff incorporates by reference the factual allegations in other federal civil rights complaints in cases pending in the United States District Court for the Southern District of New York arising from Defendants' responses to the summer 2020 protests:

    a.   *Sow et al v. City of New York et al,* 20-cv-00533(CM)(GWG);

    b.   *People of the State of New York v. City Of New York et al*, 21-cv-322 (CM)(GWG);

    c.   *Payne et al v. De Blasio et al*, 20-cv-8924 (CM)(GWG);

    d.   *Sierra et al v. City of New York et al*, 20-cv-10291 (CM)(GWG);

    e.   *Wood v. De Blasio et al*, 20-cv-10541 (CM)(GWG);

    f.   *Yates v. City of New York, et al.,* 21-cv-01904 (CM)(GWG);

    g.   *Campbell v. City of New York,* 21-cv-04056 (AJN); and

    h.   *Gray, et al., v. City of New York, et al.,* 21-cv-06610 (Unassigned).

50.     Plaintiff incorporates by reference the factual allegations in other federal civil rights complaints in cases pending in the United States District Court for the Eastern District of New York arising from Defendants' responses to the summer 2020 protests:

    i.   *Ezagui v. City of New York et al.*, 20-cv-06360 (DG)(SJB);

    j.   *Fraser v. City of New York et al.*, 20-cv-05741 (NGG)(MMH);

    k.   *Gelbard et al. v. City of New York et al*, 20-cv-03163(MKB)(RER);

    l.   *Jefferey et al. v. City of New York et al.*, 20-cv-02843 (NGG)(RML);

---

[10] Margaret Garnett, Commissioner, New York City Department of Investigation*, Investigation into NYPD Response to the George Floyd Protests*, ("DOI Report"), Dec. 2020, available at https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf; New York City Law Department, *Corporation Counsel Report Pursuant to Executive Order 58 (June 20, 2020) Directing an Analysis of Factors Impacting the George Floyd Protests in New York City* (Dec. 2020) ("OCC Report"), https://www1.nyc.gov/assets/law/downloads/pdf/ProtestReport-np.pdf.

m. *Richardson and Myrie v. City of New York et al.*, 21-cv-03609 (LDH)(SJB);

n. *Smith v. City of New York et al.*, 21-cv-03096 (DG)(TAM); and

o. *Zayer v. City of New York et al.*, 20-cv-06070 (ARR)(PK).

### PLAINTIFF REBECCA MARGOLIES'S EXPERIENCE

51.     On the night of June 4, 2020, Ms. Margolies was an essential worker, who was providing jail support to arrestees.

52.     On June 1, 2020, Mayor de Blasio issued Emergency Executive Order 117, citing an alleged escalation of protest activity to include acts of assault, vandalism, property damage and/or looting (at unspecified dates, times and/or locations) and the Mayor ordered a city-wide curfew beginning at 11:00 p.m. on June 1, 2020 until 5:00 a.m. on June 2, 2020.

53.     Then, Mayor de Blasio issued Emergency Executive Order 118, ordering a city-wide curfew from 8:00 p.m. on June 2, 2020 until 5:00 a.m. on June 3, 2020.

54.     And building on that, Mayor de Blasio finally issued Emergency Executive Order 119, ordering a city-wide curfew from June 3, 2020 to June 8, 2020 between the hours of 8:00 p.m. and 5:00 a.m.

55.     Thus, on June 4, 2020, de Blasio had established an 8:00 p.m. citywide curfew through Emergency Executive Order 119, which contained exemptions for people performing "essential work."

56.     By the terms of Emergency Executive Orders 117, 118 and 119, "a failure to comply with the Order[s] shall result *in orders to disperse*" (emphasis added).[11]

---

[11] E.O. 117 technically had a typo, stating "[f]ailure to comply with this Order shall result in orders to disburse." That typo was corrected in the subsequent Orders.

57.     That clause is linked with an "and" to the only criminal penalty provided by the Orders — meaning no violation occurred without an order to disperse, and with it, an opportunity to comply with that order:

> Failure to comply with this Order shall result in orders to disperse, and any person who knowingly violates the provisions in this Order shall be guilty of a Class B misdemeanor.

E.O. 119.  *See also*, *In re N.Y.C. Policing During Summer 2020 Demonstrations*, No. 20-cv-8924 (CM)(GWG), 2021 U.S. Dist. LEXIS 128437, at *47 (S.D.N.Y. July 9, 2021) (describing the curfew order as "explicitly requir[ing]" an order to disperse before any arrests are made); *cf. Gavin v. City of N.Y.*, No. 20-CV-8163 (JPO), 2021 U.S. Dist. LEXIS 159908, at *10 n.3 (S.D.N.Y. Aug. 24, 2021) (describing the "common-sense conclusion that [NYPD] must give protesters an opportunity to comply with their orders before they start making arrests" for failure to comply with those orders, and the "history of [NYPD] misconduct" on that front).

58.     To be clear:  Any curfew arrest made without an audible order to disperse, along with an appropriate opportunity to disperse, was unlawful.

59.     Nor did arguable probable cause exist for such arrests:  the curfew explicitly required an order to disperse, and explicitly exempted essential workers like Plaintiff.  2021 U.S. Dist. LEXIS 128437, at *47.

60.     The NYPD issued two official statements directing officers how to implement the curfew order, through the FINEST message system (which sends internal messages to NYPD members).

61.     First, on July 1, the NYPD Operations Division used the FINEST system to instruct officers that "[curfew e]nforcement will only be taken after *several* warnings are issued *and* the violator is refusing to comply."[12]

62.     However, in a FINEST message sent June 3, the NYPD Operations Division omitted any reference to warnings or orders to disperse, directing simply that "If [members of service] observe a person violating the curfew, a C-Summons may be issued for Admin. Code 3-108, Violating a Mayoral Emergency Order."[13]

63.     Upon information and belief, NYPD supervisors of various ranks then conveyed the message to individual officers that curfew arrests no longer required orders to disperse or an opportunity to comply with those orders.

64.     And upon information and belief, the June 3 FINEST message reflects a change in official NYPD policy:  the NYPD decided that, notwithstanding the terms of E.O. 119, no orders to disperse were required to make arrests for violating curfew.

65.     Thus, at the June 4 protest, as many officers have testified in other litigation, the official policy of NYPD and the City of New York was that no order was required — and that the simple fact that protesters were out past the nominal hour of curfew (even if they had been trapped there by NYPD or were providing essential services) was sufficient cause for arrests.

66.     Despite, upon information and belief, the vast majority of curfew arrests being of protesters, NYPD did not include any protest-related essential service providers in the examples in either FINEST message.

---

[12] NYPD Finest Message, *City-Wide Curfew* (June 1, 2020).
[13] NYPD Finest Message, *Curfew Extension* (June 3, 2020).

67. Upon information and belief, despite confirming that Legal Observers, jail support, street medics, and other protest-related essential service providers (like Plaintiff) were, in fact, essential workers under the E.O., Defendant de Blasio did not communicate this to the NYPD, or ensure the NYPD understood as much.

68. But Defendant de Blasio should not have needed to (though, based on prior experiences, he should have known he needed to): NYPD was also, upon information and belief, aware that protest-related essential service providers (like Plaintiff) were essential workers under the E.O.

69. In fact, virtually member of the NYPD — including, upon information and belief, each defendant — knows from experience that jail support volunteers provide essential services, including ensuring the subjects of mass arrest operations (like the Mott Haven operation) are able to contact friends and family, get a ride home (or at least to a nearby train), have all the paperwork that is required, have either recovered property or received a voucher, and so on.

70. Put differently: members of the NYPD know from experience that mass arrests would be totally non-functional and a disaster if jail support did not provide services.

71. And upon information and belief, each Defendant knew that Plaintiff was an essential worker.

72. But the top decisionmakers in the NYPD also began a campaign to undermine those clear understandings.

73. At some point prior to June 4, 2020, a meeting took place within Legal Affairs about who was exempt from the curfew and who was not.

74. Assistant Deputy Commissioner of Legal Matters (ADCLM) Oleg Chernyavsky was the ranking executive at that meeting.

14

75. Also present were lawyers from the criminal unit.

76. The conversation was not specifically about legal observers, but legal observers were discussed — as were, upon information and belief, other legal support personnel like jail support and street medics.

77. That conversation resulted in a decision that the NYPD would treat legal observers and other protest support personnel like jail support and street medics as not exempt from the curfew, notwithstanding the essential role they play in protests.

78. That decision was apparently conveyed to lower-level officers by word of mouth.

79. Earlier in the night, at the Mott Haven protest, Sgt. Kenneth Rice, reflecting those orders, yelled at a group of officers that "green hats" — meaning legal observers — should be arrested.

80. Indeed, Sgt. Rice testified that, without his direction, officers appeared unsure as to if they could arrest the legal observers.

81. Even after that, however, NYPD realized the arrests were impermissible and ultimately released every legal observer arrested at Mott Haven.

82. Upon information and belief, and in the alternative, one of two possible things happened: either (1) the individual officer-Defendants were enforcing an official NYPD policy of arresting legal support personnel, which may provide them some defense if they choose to assert it, but would leave the City with *Monell* liability; *or* (2) the individual officers acted on their own, without having received any guidance about legal support personnel, giving rise to individual liability because absent the guidance described above, NYPD policies and training (as set out elsewhere herein) make clear that that legal observers, street medics, and jail support volunteers play an essential and vital role particularly in mass arrest contexts.

15

83.     But NYPD and the City had an official policy and practice, during the period the curfew was in effect, of arresting legal support volunteers, including legal observers, street medics, and jail support, regardless of whether they were performing an essential work function — like ensuring that individual protesters had their wounds treated, were not dehydrated, had masks, and were able to get home without being arrested **again** after being stranded in a random borough[14] in the middle of the night.

84.     And ultimately, that difference is a highly fact-intensive question.

85.     Further, because of the more general official policies and practices fostering a lawless atmosphere, described elsewhere herein, that they felt emboldened to arrest Plaintiff in a retaliatory act for her association with and provision of essential services to anti-police protesters despite knowing that arrest was unlawful.

86.     NYPD's own policies and trainings mention Legal Observers (as well as their identifiable green hats) — who play a very similar role to jail support (and the personnel often overlap).

87.     And those policies explain that Legal Observers play an important role in protests.

88.     Thus, NYPD failed to train and supervise, as further detailed below, on the fact that protest-related essential workers like Plaintiff were not subject to the curfew order.

89.     As soon as the first citywide curfew related to the Justice for George Floyd protests was announced on June 1, 2020, the National Lawyers Guild- NYC Chapter and others providing critical legal support to arrested protesters sought to confirm on an emergency basis that the City viewed Legal Observers, and legal workers performing jail support, as exempt "essential workers."

---

[14] The arrests at Mott Haven in particular resulted in protesters being carted to several boroughs.

90.     Also on June 1, 2020, representatives of Defendant de Blasio's Office confirmed in writing that people providing legal and medical support to arrested protesters were exempt from the curfew, including Jenny Sobelman, Chief of Staff, Mayor's Office of State Legislative Affairs and Tan Persephone, a Legislative Representative at the Mayor's Office of City Legislative Affairs (who cc'd Eric Cecil Henry, General Counsel, City Legislative Affairs – Office of the Mayor).

91.     Put a different way, the Mayor's Office issued official guidance making clear jail support volunteers were essential workers and therefore exempt from the curfew.

92.     Armed with — and relying on –- those confirmations from the City that LOs and jail support were "essential workers", Jail Support NYC drafted an "Attestation of Essential Services" to provide to LOs and jail support who would volunteer during the curfew.

93.     On June 4, 2020, Ms. Margolies had Jail Support NYC's Attestation of Essential Services printed on letterhead in her possession.

94.     Upon information and belief, any reasonable officer who reviewed that Attestation would be left with no doubt whatsoever that Ms. Margolies was an essential worker — and that the Mayor had issued specific guidance to that effect.

95.     At around 10:45 p.m., following the arrest of hundreds of people in the Mott Haven area of the Bronx, and in her role doing the essential work of jail support, Ms. Margolies went to the 40th Precinct stationhouse in order to locate arrestees and to provide food and water for people released from custody.

96.     At the 40th Precinct stationhouse, NYPD Defendant Jane Doe 1 refused to provide Ms. Margolies with the location of the recent arrestees.

97.     Defendant Doe 1 told Ms. Margolies that the people she was looking for were probably taken to Queens County Central Booking.

98.     In light of this information, Ms. Margolies and three other jail support and medic volunteers walked to a car, to drive to Queens County Central Booking.

99.     The medic volunteer was a doctor, and was wearing scrubs and a badge identifying her as such.

100.     Upon information and belief, any reasonable officer who saw the medic volunteer would understand that medic to be an essential worker exempt from the curfew.

101.     As Ms. Margolies and the others loaded up the car with their supplies, Defendants NYPD Members John Does 2-29 surrounded Ms. Margolies and the other essential workers she was with.

102.     Ms. Margolies informed one of Defendants Doe 2-29, who was wearing a white shirt uniform, that she was a jail support volunteer, and therefore an essential worker, and that she that she had an attestation letter.

103.     Despite this, the Defendant Doe in a white shirt, told Ms. Margolies that she was under arrest.

104.     The Defendant Doe refused to review the Attestation.

105.     The Defendant Doe saw the medic in scrubs.

106.     The Defendant Doe *in fact* knew the entire group were essential workers.

107.     Had the Defendant Doe reviewed the Attestation, he would have known that the Mayor had specifically issued guidance that jail support were essential workers.

108.     The Defendant Doe knew that reviewing the Attestation would likely provide that information.

109. Upon information and belief, the Defendant Doe deliberately refused to review the attestation in an attempt to be able to claim he had never specifically found out the Mayor said Plaintiff and the others being arrested were essential workers.

110. Put differently, the Defendant Doe and others were deliberately and willfully blind to the fact that Plaintiff and others were essential workers. *See generally, Global-Tech Appliances, Inc. v. SEB S.A*., 563 U.S. 754 (2011).

111. Defendants also failed to issue *any* order to disperse.

112. That is, even if Plaintiff were not *clearly* an essential worker (she was), Defendants did not have probable cause — arguable or otherwise — to arrest Plaintiff for a curfew violation, because they did not follow the requirements of the curfew order.

113. In doing so, Defendants apparently decided to violate "the City's official policy … say[ing] that dispersal orders should be given" and Defendants chose to "ignore what the curfew order said." *In re N.Y.C. Policing During Summer 2020 Demonstrations*, No. 20-cv-8924 (CM)(GWG), 2021 U.S. Dist. LEXIS 128437, at *46-47 (S.D.N.Y. July 9, 2021).

114. One of Does 2-29 placed Ms. Margolies in metal handcuffs.

115. At approximately midnight on the night of June 4/morning of June 5, 2020, Defendant DeStefano issued Claimant a summons.

116. On September 9, 2020, the charges against Ms. Margolies were dismissed in the interest of Justice.

117. The Defendants' conduct directly and proximately caused physical and emotional injury to Ms. Margolies, including anxiety.

118.    Defendants' actions also were intended and did prevent protesters from receiving essential services from Plaintiff and those she was with, and Plaintiff is best positioned to assert those injuries.

## NYPD'S PERMISSIVE RESPONSE TO PRO-POLICE AND OTHER, SIMILAR DEMONSTRATIONS

119.    The NYPD's violent response to this protest against police brutality was dramatically different from their response to other kinds of protests and rallies.

120.    On July 11, 2020, pro-police demonstrators held a "Rally to Back the Blue" in Dyker Heights, Brooklyn. Pro-police marchers yelled at and antagonized counter-protestors, making racist and sexist statements, grabbing them, and spitting in counter protestors' faces. The NYPD made no arrests at the rally.[15]

121.    On July 13, 2020, pro-police "Blue Lives Matter" groups held a march in Bay Ridge, Brooklyn. The march was attended by counter protestors organized against police brutality. Though members of the pro-police group shouted racist and homophobic slurs at the counter protesters and assaulted them in view of NYPD officers, only two people were arrested – both Black men protesting police brutality. By contrast, a Blue Lives Matter demonstrator who punched a woman in the face in view of NYPD officers was not arrested.[16]

122.    In October 2020, hundreds of members of the ultra-Orthodox Jewish community in Brooklyn gathered in Borough Park to protest coronavirus restrictions imposed by Governor Cuomo. The protestors set fires in the street and threw masks into the flames. They chased away

---

[15] Sydney Pereira, *Videos Show Pro-Police demonstrators in Brooklyn Unleashing Racist, Sexist Vitriol Against Counter-Protestors*, Gothamist, July 12, 2020, available at https://gothamist.com/news/police-rally-back-the-blue-brooklyn-dyker-heights.

[16] Jake Offenhartz and Gwynne Hogan, *"They Defend Their Own Side": NYPD Accused of Protecting Blue Lives Matter Marchers in Bay Ridge*, Gothamist, July 13, 2020, available at https://gothamist.com/news/nypd-accused-protecting-violent-blue-lives-matter-marchers-bay-ridge.

NYC Sheriff's Deputies and attacked a photojournalist reporting on the protest. An ultra-Orthodox Jewish man who opposed the protestors was attacked by protestors and beaten with rocks. Police said that no arrests or summons were issued to the protestors on the night of the rally.[17]

123.    On October 25, 2020, a group called Jews For Trump convoyed hundreds of cars draped with American flags and Trump 2020 banners. The caravan traveled from Coney Island to the Trump Tower in Manhattan before heading to a rally in a Brooklyn park. Despite engaging in acts of disorder during this caravan, this rolling group of pro-Trump agitators was allowed to continue unhindered by the NYPD.[18]

124.    On November 1, 2020, a coalition of Trump supporters in a vehicle caravan were escorted through New York City despite blocking numerous bridges and committing acts of violence. One bystander attempted to photograph an obscured license plate of a vehicle in the caravan, but the driver of the vehicle drove into her and police threw her to the ground.[19]

125.    On December 2, 2020, hundreds gathered in Staten Island to demand the reopening of a bar that was closed for violating the heath regulations related to COVID-19. Protestors blocked traffic and hundreds gathered on the streets and sidewalks. Though NYPD deputies were stationed outside the bar, it was reported that no arrests or summons were issued.[20][21]

---

[17] Jake Offenhartz, *Orthodox Borough Park Residents Burn Masks, Beat Dissenters Over COVID Lockdown*, Gothamist, Oct. 7, 2020, available at https://gothamist.com/news/orthodox-borough-park-residents-burn-masks-beat-dissenters-over-covid-lockdown.

[18] AP, *Jews For Trump car parade stirs protests, fights across NYC*, Oct. 26, 2020, available at https://abc7ny.com/jews-for-trump-times-square-protest-today-in-riot/7343862/

[19] Jake Offenhartz, *Photos: Police Stand By As Caravans Of Trump Supporters Block Bridges, Gothamist*, Nov. 2, 2020, Threaten Counter-Protesters, available at https://gothamist.com/news/photos-police-stand-caravan-trump-supporters-block-bridges-threaten-counter-protesters

[20] Wilson Wong, *Hundreds protest closing of Staten Island bar that refused Covid-19 measures*, NBC NEWS, Dec. 3, 2020, available at https://www.nbcnews.com/news/us-news/hundreds-protest-closing-staten-island-bar-refused-covid-19-measures-n1249873

[21] NBC News 4, *Staten Island Bar Reopens, Defying City and State COVID Orders Once Again*, December 5, 2020, available at https://www.nbcnewyork.com/news/coronavirus/staten-island-bar-reopens-defying-city-and-state-covid-orders-once-again/2762850/

126.    The NYPD has a history of treating even right-wing extremists more permissively. This pattern can be observed from the 1990s to the present.

a.    In the early 1990s the NYPD stood by and took no action when a group of skinheads attacked a group of peaceful demonstrators. *Dwares v. City of New York*, 985 F.2d 94 (2d Cir. 1993).

b.    In 1992, the Patrolmen's Benevolent Association, egged on by mayoral candidate Rudy Giuliani, held a demonstration at City Hall Park in response to Mayor Dinkins's call for a Civilian Complaint Review Board. This led to one of the biggest riots in New York City history. On-duty police officers who were present did little to stop it, and even encouraged it, despite the fact that the off-duty rioting officers blocked the Brooklyn Bridge, stormed City Hall, committed acts of vandalism, and assaulted bystanders.[22],[23]

c.    More recently, the NYPD has turned a blind eye to violence committed by the Proud Boys and other neo-Nazi groups. In one such instance in October of 2018, a mob of uniformed Proud Boys and right-wing skinheads cried homophobic slurs and kicked and stomped a person laying on the sidewalk. NYPD officers observed the violence, but did not intervene to stop it. Instead, the NYPD was more concerned with controlling left-wing activists.[24] During this incident three left wing activists were arrested but not a single Proud Boy was questioned or arrested. Proud Boy leader Gavin McInnes boasted about the incident that the group had support from "[t]ons of cops, I have a lot of support in the NYPD…"[25]

**THE NYPD'S HISTORY OF MISHANDLING CERTAIN PROTESTS**

127.    The extensive deprivations of constitutional rights suffered by Plaintiff here are part of the NYPD's long history of aggressive and unconstitutional policing of certain First Amendment-protected activities going back many years, including, inter alia, protests denouncing the murder of Amadou Diallo in 1999, as well as protests against the World Economic Forum (the

---

[22] Nat Hentoff and Nick Hentoff, *Rudy's Racist Rants: An NYPD History Lesson*, Cato.org, July 14, 2016, available at https://www.cato.org/commentary/rudys-racist-rants-nypd-history-lesson

[23] Pamela Oliver, *When the NYPD Rioted*, University of Wisconsin – Madison, July 18, 2020, available at https://www.ssc.wisc.edu/soc/racepoliticsjustice/2020/07/18/when-the-nypd-rioted/

[24] Jake Offenhartz, *NYPD Accused Of 'Incredibly Deferential Treatment' Of Proud Boys Following Beatings Caught On Video*, available at, https://gothamist.com/news/nypd-accused-of-incredibly-deferential-treatment-of-proud-boys-following-beatings-caught-on-video

[25] Jake Offenhartz, *Proud Boys Leader: 'I Have A Lot Of Support In The NYPD'*, Gothamist, Oct. 15, 2018, https://gothamist.com/news/proud-boys-leader-i-have-a-lot-of-support-in-the-nypd

"WEF") in 2002, the Iraq War in 2003, the Republican National Convention ("RNC") in 2004, the Occupy Wall Street ("OWS") protests in 2011 and 2012, and many other protests since, including Black Lives Matter and anti-police brutality protests.

128.    The NYPD response to the protests in New York City the summer of 2020 was in line with its history of violent and unconstitutional responses to past protests challenging police conduct in New York City, including its treatment of certain First Amendment assemblies with demoralizing and brutal shows of force, rather than genuine efforts to facilitate protesters' protected First Amendment activity.

129.    For example, the NYPD met protests following the start of the Iraq War in 2003 with mass arrests, excessive force, use of pepper spray, riding horses into crowds and batons strikes to disperse protestors, and kettling to move protestors from specific locations to effectuate mass arrests.[26]

130.    The next year, during the police "Operation Overlord II" operation in response to the Republican National Convention in 2004, NYPD members treated protestors to similar uses of kettling tactics, excessive force and mass arrests, and excessive and unreasonable detention.[27]

131.    The NYPD continued to employ similar mass arrest and excessive force tactics during a years-long crackdown on Critical Mass bicycle rides beginning in 2004.[28]

132.    Similarly, during the Occupy Wall Street ("OWS") protests in 2011, the NYPD used excessive force against protestors, bystanders, and National Lawyers Guild – New York City Chapter Legal Observers, as well as kettling tactics to move protestors or initiate mass arrests.[29]

---

[26] *See, e.g.*, N.Y. Civil Liberties Union, Arresting Protest (2003), *available at* https://www.nyclu.org/sites/default/files/nyclu_arresting_protest.pdf.
[27] *See, e.g.*, N.Y. Civil Liberties Union, Rights and Wrongs at the RNC (2005), *available at* https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_rnc.pdf.
[28] *See, e.g., Callaghan v. City of New York*, 07 Civ. 9611 (PKC)(JLC) (S.D.N.Y.).
[29] *See People of the State of New York v. City of New York et al.*, 21-cv-0322, Dkt. No. 1 at ¶ 26 (S.D.N.Y.).

133.    Additionally, Defendants have employed the same tactics and practices against Black Lives Matter, police accountability, and other, similar protests, over the intervening years.

134.    Following NYPD conduct during these and other protests, the City of New York and the NYPD and its members have been sued repeatedly by protestors who alleged that they had been unlawfully detained, kettled, arrested, subjected to mass arrest, unreasonable and prolonger detentions and violations of their First Amendment and other, related rights, much in the same manner as has the Plaintiff in this case.

135.    In many of these cases Defendants employed tactics developed and modified over the course of many years by Defendants Shea, Monahan, and their predecessors and by other defendant City policymakers at and in connection with other demonstrations in the City dating back to around 2000 and continuing through the present, including the policies, practices, and customs complained of herein, and also described and litigated in the following cases:

a.    *Mandal v. City of New York.,* 02-cv-1234 (WHP)(FM) (S.D.N.Y.) and related cases challenging NYPD's written and unwritten policies and practices enacted after the police shooting of Amadou Diallo in 1999 and formalized in writing as early as 2001. As a result of these policies, the NYPD began detaining and fully processing people arrested for non-criminal violations who were otherwise eligible to be processed and released with Desk Appearance Tickets ("DATs"). *See, e.g., "Mandal I,"* No. 02-cv-1234 (WHP), 02-cv-1367 (WHP), 02-cv-6537 (WHP), 2006 WL 2950235, at *4-7 (S.D.N.Y. Oct. 17, 2006) (denying summary judgment on plaintiffs' Fourteenth Amendment Equal Protection and First Amendment-based claims that the policies "constituted facial violations of [plaintiffs'] First Amendment rights because they were denied DATs or summonses based on the fact that they participated in demonstrations"); *Mandal v. City of New York* ("*Mandal II*"), No. 02-cv-1234 (WHP), 02-cv-1367 (WHP), 2007 WL 3376897, at *2 (S.D.N.Y. Nov. 13, 2007) ("*Mandal II*") (noting that approximately 38 *Mandal* plaintiffs prevailed at trial on claims that "the City had an unconstitutional written policy of denying persons arrested at demonstrations individual consideration for summonses and DATs");

b.    *Burley v. City of New York*, 03-cv-2915 (WHP)(FM) 2005 WL 668789 (S.D.N.Y. March 23, 2005) (class action arising from mass arrests of over 200 demonstrators during 2002 WEF in New York City challenging, *inter alia*, (1)

NYPD policy of detaining perceived protesters who were otherwise eligible to be released earlier with DATs for excessive periods of time and denying them consideration for DAT release on the grounds of their perceived participation in protests and (2) policy and practice of using plastic flex cuffs as unreasonable and excessive because of the manner in which the handcuffs were applied and the length of time for plaintiffs were handcuffed);

c.  *Allen v. City of New York,* 466 F. Supp. 2d 545, 546 (S.D.N.Y. 2006) (challenging mass arrests made in February 2002 related to the WEF alleging, *inter alia*, that the protestors remained on the sidewalk, walking two abreast and followed all rules of protesting, yet Executive Officers including Defendant Monahan, arrested them and "the police deliberately held [protesters] in custody for an unnecessarily long period of time in order to delay their arraignment in Criminal Court";

d.  *Haus v. City of New York,* 03-cv-4915 (RWS)(MHD) 2006 WL 1148680, *1 (S.D.N.Y. April 24, 2006) (class action challenging arrests, detentions, and prosecutions of around 300 people in connection with February 15, 2003 anti-war protests, alleging that arrests were made without probable cause and pursuant to Department directive to "engage in pre-emptive mass arrests and to subject arrestees to delayed and arduous post-arrest processing." *See also Larsen v. City of New York, et al.*, 04-cv-0665 (RWS) (S.D.N.Y.);

e.  *Kunstler v. City of New York*, 04-cv-1145 (RWS)(MHD) (S.D.N.Y.) and other related cases arising from alleged false and retaliatory arrests in connection with police responses to protests on April 7, 2003, raising *Monell* and other claims similar and related to the policies and practices complained of herein such as encircling protesters, striking them with nightsticks, and using extremely tight plastic handcuffs in their arrest;

f.  *MacNamara v. City of New York*, 04-cv-9216 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Class Action Complaint, Dkt. No. 200-2), *Abdell. v. City of New York*, 05-cv-8453 (RJS)(JCF) (S.D.N.Y.), *Schiller. v. City of New York*, 04-cv-7922 (RJS) (JCF) (S.D.N.Y.), *Dinler v. City of New York*, 04-cv-7921 (RJS)(JCS) (S.D.N.Y.), *Kyne v. Wolfowitz,* 06-cv-2041 (RJS)(JCF) (S.D.N.Y.) (including the Second Amended Complaint, Dkt. No. 18), and the dozens of other cases consolidated for discovery purposes in the S.D.N.Y. arising from arrests made, and policies related to, the RNC in New York City in 2004. *See, e.g., Schiller*, No. 04-cv-7922 (RJS)(JCF), 2008 WL 200021 at *2-5 (S.D.N.Y. Jan. 23, 2008) (noting the City's consent to amendment of complaints in RNC cases to add, *inter alia*, "constitutional challenges to the defendants' alleged practice of detaining . . . all persons in connection with the RNC . . . no matter how minor the infraction, rather than issuing summonses on the street"); *MacNamara v. City of New York,* 275 F.R.D. 125, 154 (S.D.N.Y. 2011) (certifying six "mass arrest subclasses" as well as an "Excessive Detention Class" comprised of all RNC arrestees who were processed pursuant to the RNC Mass Arrest Processing Plan and a "Conditions of Confinement Class, comprising all RNC arrestees who were

handcuffed with plastic flex cuffs[.]"); *Dinler*, No. 04-cv-7921 (RJS)(JCF), 2012 WL 4513352, at *13-15 (S.D.N.Y. Sept. 30, 2012) (granting plaintiffs' motions for summary judgment on their false arrest claims related to hundreds of people mass arrested at 2004 RNC in connection with a War Resisters League march and denying defendants' cross-motion on false arrest claims);

g.  *Callaghan v. City of New York,* 07-cv-9611 (PKC)(JLC) (S.D.N.Y.) (including the Third Amended Complaint, Dkt. No. 14) (multi-plaintiff litigation challenging mass arrest policies, practices, and incidents related to post-2004 RNC Critical Mass crackdown spanning several years, pleading *Monell* claims virtually identical to the core *Monell* claims pleaded herein));

h.  *Osterhoudt v. City of New York, et al.*, No. 10-cv-3173 (RJC)(RML), 2012 WL 4481927, at *1-2, (E.D.N.Y. Sept. 27, 2012) (and the Second Amended Complaint and Demand for Jury Trial, Dkt. No. 22) (denying defendants' motion to dismiss *Monell* claims where plaintiff, who was arrested on during mass arrest on election night in November 2008, cited other lawsuits against the City for mass arrests at Critical Mass bike rides, the 2004 RNC, and the WEF including "a number of complaints alleging that the NYPD conducted mass arrests at demonstrations and in crowd control situations, plausibly alleging a widespread departmental policy of arresting political demonstrators without determining probable cause on an individual basis");

i.  Despite (then-Mayor Michael Bloomberg's recognition that, "the majority of the [OWS] protesters have been peaceful and responsible,"[30] there were more than ninety civil rights actions filed in the S.D.N.Y. arising from NYPD OWS arrests and related polices, including, but not limited to, the cases listed in *Marisa Holmes v. City of New York, et al.*, 14-cv-5253 (LTS) (S.D.N.Y.) (Dkt. No. 13 ¶ 89) (listing by caption and docket numbers of many OWS-related cases as of March 13, 2015). Some of those cases resulted in judgments and many resulted in substantial settlements prior to trial including *Gerskovich v. Iocco,* 15-cv-7280 (S.D.N.Y. Berman, J.) that settled for $256,000 prior to trial, and which complaint had a similar failure to train Monell claim that had been sustained through Defense Rule 12 and Rule 56 motions;

j.  In *Peat v. City of New York,* No. 12-cv-08230 (S.D.N.Y.), fifteen OWS plaintiffs arrested on January 1, 2012, on the sidewalk in the East Village settled a case with Defendant City of New York for $598,000. The settled complaint alleged that plaintiffs were peacefully and lawfully protesting when executive members of the NYPD blocked their path on the sidewalk,[31] encircled them on three sides

---

[30] Michael Bloomberg, *Michael Bloomberg's Statement on the Zuccotti Park Clearance*, The Guardian (Nov. 15, 2011, 8:39 EST), http://www.guardian.co.uk/world/2011/nov/15/michael-bloomberg-statement-zuccotti-park.

[31] In March and April 2012, NYCLU issued Free Speech Threat Assessments detailing the NYPD's restriction on protester activity and engaging in a manner to obstruct protester's ability to engage in First Amendment activity and identified how executive "supervising officers, at random and without warning, pointed to protesters they wanted

and a building line on the fourth side. The NYPD made dispersal announcements without providing sufficient time or a path of egress as members of the scooter task force blocked the protesters path of egress;

k.   Other OWS-related cases have continued through discovery and are awaiting trial, including two cases involving failure to train claims similar to those at issue in this case, which are currently scheduled for trial: *Packard* v. *City of New York* 15-cv-7130 (S.D.N.Y.) (AT) and *Case v. City of New York,* 14-cv-9148 (S.D.N.Y.) (AT)*;*

l.   The Plaintiffs in *Case, et al. v. City of New York, et al.*, 14-cv-9148 (AT)(BCM) were arrested at an Occupy Wall Street protest and subjected to certain NYPD large-scale arrest processing rather than being released on the street with a summons as a result, including *Monell* claims with much in common with many of those raised herein. *See Case v City of NY*, 233 F. Supp. 3d 372 (SDNY 2017); 408 F.Supp.3d 313 (SDNY 2019);

m.   The Union Square litigations related to the mass arrests that occurred in and around Union Square Park on September 24, 2011, alleged similar NYPD misconduct that is alleged in this pleading, including, failure to provide reasonable dispersal orders and opportunity to disperse, unnecessary and excessive force used on protesters and overall efforts of the NYPD to deter and demoralize protesters. Nearly all of these cases include multiple plaintiffs and were all settled by the City of New York, including *Clarke v NYC*, 13-cv-(RWS); *Crisp v. NYC,* 12-cv-5482(RWS); *Dedrick v. NYC*, 12-cv-7165(RWS); *Dierken v. NYC*, 12-cv-7462(RWS); *Elliot v. NYC*, 12-cv-992(RWS); and *Hanlin v. NYC*, 12-cv-5844(RWS);

n.   Those cases OWS related cases referenced herein, *Gerskovich, Packard, Case, Peat,* the Union Square Litigations, as well *as* several other OWS-related cases, included failure to train *Monell* claims concerning protest activity that are similar to the *Monell* claims in this litigation;

o.   The incidents discussed in the 2003 NYCLU special report created by the NYCLU in the wake of the February 15, 2003 antiwar demonstration, titled *Arresting Protest*, published April 2003, *available at* https://www.nyclu.org/sites/default/files/publications/nyclu_pub_arresting_protes t.pdf;

p.   The incidents discussed in the 2005 NYCLU special report created by the NYCLU in the wake of protests at the RNC, titled *Rights and Wrongs at the RNC*, published in 2005, *available at* https://www.nyclu.org/sites/default/files/publications/nyclu_pub_rights_wrongs_r

---

arrested for disorderly conduct, unreasonable noise, resisting arrest and obstructing governmental administration." https://www.nyclu.org/en/nyc-free-speech-threat-assessment.

nc.pdf;

q.   The incidents discussed in the research compiled by The Global Justice Clinic at the New York University School of Law and the Walter Leitner International Human Rights Clinic at the Leitner Center for International Law and Justice at Fordham Law School in their publication titled *Suppressing Protest: Human Rights Violations in the U.S. Response to Occupy Wall Street*, published July 25, 2015, *available at* http://hrp.law.harvard.edu/wp-content/uploads/2013/06/suppressing-protest-2.pdf; and

r.   *Edrei v. City of New York*, 16-cv-01652 (JMF)(BCM) (challenging NYPD uses of Long Range Acoustic Device ("LRAD") against perceived "group" for crowd control purposes, including *Monell* allegations challenging many of the same policies and practices herein, *see, e.g.,* First Amended Complaint at Paragraph 415).

## THE NYPD'S FAILURE TO TRAIN REGARDING PROTEST POLICING

136.    Since at least the 1990s, the NYPD has failed to appropriately train its officers on the proper handling of First Amendment assemblies, despite being on notice of serious constitutional deficiencies in their existing training.

137.    In fact, the NYPD's core training related to protest response to this day is based on crowd management and disorder control tactics for policing large-scale civil disorder and riots.

138.    In 1997, the NYPD's Disorder Control Unit ("DCU") created the "Disorder Control Guidelines."

139.    Upon information and belief, to this day, that document forms the core the NYPD protest response-related training.

140.    The Disorder Control Guidelines treat disorders as military engagements and copies military tactics and focus on tactics designed to *deter, disperse, and demoralize* groups, including by staging overwhelming presence and force at protest activity, as well as making early and "pro-active" arrests, and mass arrests, using disorder control formations, encirclement or kettling, and other, similar tactics.

28

141.    Upon information and belief, the core NYPD training, based on the Disorder Control Guidelines, focuses on the use of such tactics to – using the trainings' terminology – "disperse and demoralize" protesters.

142.    These disperse and demoralize tactics and trainings have persisted through the present as exemplified by the experiences of the Plaintiff in this case.

143.    Upon information and belief, the Disorder Control Guidelines were never meant to be guidelines for the policing of lawful First Amendment assemblies such as demonstrations – only for large-scale civil disorder such as riots.

144.    However, neither the Disorder Control Guidelines, nor, upon information and belief, any related NYPD training, contain meaningful direction on the core First, Fourth, or Fourteenth Amendment principles that must guide constitutional policing of First Amendment assemblies.

145.    On information and belief, there was, and is, virtually no NYPD training—and certainly no *meaningful* NYPD training—focusing on how to utilize the tactics described in the Disorder Control Guidelines without infringing on the constitutional rights of protesters, such as how to make probable cause determinations or the requirements of providing an alternative avenue of protest, meaningful time and a path of egress when issuing a dispersal order, and the like.

146.    438.    Defendants' failures to train, which led to violations of Plaintiff's rights in this case, include, *inter alia,* the following:

    a.    The failure to make clear the need provide constitutionally meaningful dispersal orders and opportunities to disperse or other, similar fair warning prior to using force or taking other enforcement action, including, for example, the manner in which to inform demonstrators they must move or disperse, how many warnings to give before taking enforcement action, the length of time to be given in order to provide a meaningful opportunity to comply, and the like;

b.     The failure to convey the clear guidance that jail support workers were essential workers;

c.     The failure to make clear the need for individualized probable cause to arrest in a protest context;

d.     The failure to provide training on the use of reasonable and proportionate force in connecting with policing First Amendment assemblies;

e.     The failure to provide training on the need for, or tactics regarding, escort and facilitation of First Amendment activities, and instead focuses almost exclusively on tactics designed to "disperse and demoralize" protesters; and

f.     The failure to provide training on the importance and need for NYPD members to wear masks during the COVID-19 pandemic, to provide masks for arrestees, and to allow arrestees to engage in mask-wearing, social distancing, handwashing, and other, similar safety measures in light of the COVID-19 pandemic.

147.    Although many of the above problems with the NYPD's training are endemic and cut across all of the relevant NYPD training, at present, Defendant City has a policy and practice of deploying one particularly problematic, inadequately trained, poorly supervised and disciplined group of NYPD members: the NYPD's Strategic Response Group ("SRG").

148.    The SRG, deployed around the City at protests in 2020 including those that are the subject of this lawsuit, was created in 2015 as a specialized unit tasked with responding to disorder-causing events and to conduct counter-terrorism operations.

149.    The SRG has a unit in each of the five boroughs and the DCU has now been incorporated into the SRG.

150.    In response to the public's skepticism that the SRG would be used to crack down on protests, then-Chief of Department James O'Neill stated: "They will not be involved in handling

protests and demonstrations. They'll have no role in protests. Their response is single-fold. They'll be doing counter-terror work. They'll be assigned to different posts throughout the city."[32]

151.    However, since 2015, the SRG has been regularly deployed at protests, including those in 2020 related to the present lawsuit.

152.    Many SRG members, including many of those deployed to the protests in 2020 that are the subject of this lawsuit, have histories of engaging in the kinds of misconduct complained of herein, documented among other places, by CCRB complaints, and in numerous lawsuits.[33]

153.    SRG members are meant to have additional DCU training.

154.    Upon information and belief, that additional DCU training is principally modelled on the core principles and tactics in the Disorder Control Guidelines.

155.    However, many of the officers deployed to respond to the protests in 2020 did not even receive *that* training, which was supposedly required of them.

156.    As a result, as noted in the OCC Report, "for a majority of the officers who were assigned to the George Floyd protests, their training on policing protests was limited to what they had received as recruits in the Academy."[34]

157.    Between at least 2004 and the present, the NYPD's mass arrest and violent crowd control and protest policing tactics have been on full display in the streets of New York City; the subjects of unfavorable coverage in the media, including coverage explicitly showing video evidence of NYPD members engaging in uses of excessive force in connection with crowd control while policing protests; documented in complaints to the Civilian Complaint Review Board and

---

[32] Ben Yakas, *NYPD: Fine, Maybe We Won't Police Protests With Machine Guns*, Gothamist, Jan. 30, 2015, *available at* https://gothamist.com/news/nypd-fine-maybe-we-wont-police-protests-with-machine-guns.

[33] Ali Winston, *NYPD Unit At Center Of Protest Policing Has Dozens Of Officers With Long Misconduct* Histories, The Appeal, Oct. 15, 2020, *available at* https://theappeal.org/nypd-srg-misconduct/.

[34] OCC Report at 37.

other agencies; as well as the litigations discussed above, which have cost the city tens of millions of dollars in judgments and settlements.

158.    Indeed, in connection with the 2002 World Economic Forum and the 2004 RNC policing operations, NYPD supervisors - including DCU supervisors charged with designing and implementing NYPD protest policing-related policies and related training – routinely created "after action reports" that documented and critiqued NYPD plans for and responses to protest activities.

159.    For example, in a March 17, 2006 *New York Times* article that was published while discovery about related policies and practices was ongoing in the 2004 RNC litigations, "Police Memos Say Arrest Tactics Calmed Protest," Jim Dwyer reported on the revelation of 2002 WEF after-action reports in then-ongoing litigation, *Allen v. City of New York*, 03-cv-2829 (KMW) (GWG) (SDNY).[35]

160.    Those reports praised employing militarized tactics such as the "staging of massive amounts" of officers in riot gear including riot helmets and militarized "equipment" such as armored vehicles, prisoner wagons, and buses in view of demonstrations in order to "cause them to be alarmed" and as a "deterrent" as well as the use of "proactive" arrests in order to have a "powerful psychological effect" on protesters.

161.    After the 2002 WEF after-action reports were disclosed in *Allen* and the 2004 RNC-related after-action reports were disclosed in the RNC litigations, and some of them were made public as a result, upon information and belief, rather than continuing to create such reports frankly

---

[35] Jim Dwyer, "Police Memos Say Arrest Tactics Calmed Protest," N.Y. Times, March 17, 2006, available at https://www.nytimes.com/2006/03/17/nyregion/police-memos-say-arrest-tactics-calmed-protest.html.

documenting and assessing the NYPD's protest policing-related policies and tactics, the NYPD opted to stop creating such records.

162.    For example, according to the Corporation Counsel's report, NYPD records do not show any protest-related after action reviews undertaken between the 2004 Republican National Convention until the events of the George Floyd protests.

163.    Nevertheless, upon information and belief, at all times relevant herein, Defendants de Blasio, Shea, Monahan, and other defendant City policymakers, routinely received reports regarding arrests made in connection with First Amendment assemblies, including through internal reports such as Unusual Occurrence Reports; Mass Arrest Reports including data tracking arrestees, the length of time it took them to go through the system, whether they were released with a summons or DAT, their proposed arrest charges, and other information related to the status and/or dispositions of the cases; internal critiques from supervisors and other officers involved in mass arrests related to police actions taken in relation to an event; and/or other reports including information arrests, use of force protest arrest processing, and/or related prosecutions.

164.    Despite the wealth of evidence of NYPD members' historical brutality against protesters, Defendant City has ignored, and/or failed to utilize, relevant information, including information gleaned from reports and lawsuits, as well as other data points, to identify deficiencies in NYPD training as it relates to constitutionally compliant protest policing.

165.    For example, in a deposition in *Packard v. City of New York,* 15-cv-7130 (S.D.N.Y.) (AT), a witness for the City of New York testified that in regard to protest police training it did not review (i) decline to prosecute decisions, (ii) conviction conversion rates or (iii) allegations and settlements in lawsuits relating to protest.

166.    As another example, Defendant City apparently does not take allegations in lawsuits filed by protesters claiming they were falsely arrested during protests into account in considering its protest policing-related policies and training, in effect taking the position that there is nothing to be learned from lawsuits and settlements.

167.    For example, in a 2017 deposition, a Fed. R. Civ. P. 30(b)(6) witness designated to testify on sidewalk policy protesting, dispersal orders, and training on probable cause standards for crimes commonly charged in protest policing by the Defendant City could identify no impact that litigation against Defendant City between 2000 and 2011 had on Defendant City's relevant policies, practices, customs, or NYPD training.

168.    Relatedly, according to the Corporation Counsel, "the NYPD does not demonstrate a consistent commitment to reviewing and responding to external critiques regarding the policing of protests."[36]

169.    At bottom, the NYPD's near-exclusive focus on deterring, dispersing, and demoralizing in trainings related to policing protests, coupled with the failure to train on specific, relevant aspects of constitutional policing of protests, let alone how to encourage or facilitate protests—despite having received clear notice that NYPD policing of protests has caused the systemic violations of protesters' constitutional rights for years—demonstrates both a history and a policy, of disregard for the First Amendment, Fourth Amendment, Fourteenth Amendment, and other, related rights of Plaintiff and other similarly injured protesters.

## THE NYPD'S POLICY AND/OR PRACTICE
## OF USING EXCESSIVE FORCE TO CONTROL THE SPEECH OF PROTESTORS

---

[36] OCC Report at 2, 30.

170.    Defendants used types and levels of force that were excessive and unnecessary force against the Plaintiff.

171.    In many cases, those uses of force were in contravention of, or inconsistent with, related, written NYPD policies and/or training.

172.    In many cases, Defendants failed to document, and/or require that fellow Defendants and/or other fellow officers document, uses of force in accordance with related NYPD policies and/or training.

173.    In many cases, Defendants used force against Plaintiff based on her position in or proximity to a perceived group, as well as the perception that she would be providing aid to that group, without first having given the perceived group clearly communicated prior notice as well as a meaningful opportunity to comply with police orders and/or dissociate with the perceived group.

174.    In many cases, Defendants used types of force that they knew, or should have known, would impact numerous people at one time, and/or cause lasting pain, suffering, and/or injury, without making individualized or otherwise appropriate determinations about whether those uses of force were necessary, justified, or reasonable under the circumstances.

**DEFENDANT CITY'S POLICIES AND PRACTICES REGARDING ARRESTS—INCLUDING MASS ARRESTS—WITHOUT FAIR WARNING**

175.    Defendant City had a policy, practice, and/or custom in the summer of 2020 of engaging in arrests, including mass arrests, without first providing fair warning.

176.    Defendant City had a policy, practice, and/or custom in the summer of 2020 in engaging in arrests, including mass arrests, for purported violations of the Curfew Orders, without first having provided a clearly communicated and lawful dispersal order, followed by a

meaningful opportunity to disperse, and an actual refusal to disperse, prior to taking enforcement action.

177.    In many cases, even where NYPD members did give dispersal orders, they did not then provide a means of egress or other meaningful opportunity to comply.

178.    In Plaintiff's case, NYPD members surrounded and arrested jail support and medical volunteers — all clearly essential workers — without providing any dispersal order.[37]

179.    In some cases, like Plaintiff's, Defendants seized protesters and those associated with them, based on the perception that they were part of a perceived group, without having made an individualized determination that there was probable cause to arrest the Plaintiff in question based on their own, individual conduct, as opposed to the perceived "group conduct" — or based on perception that people like Plaintiff were associated with those advancing an anti-police message, which Defendants intended to chill.

180.    In some cases, like Plaintiff's, Defendants failed to give constitutionally meaningful and adequate dispersal orders and meaningful opportunities to disperse prior to making arrests where such notice and opportunity were required.

181.    That enforcement was consistent with widespread NYPD policy, practice, and/or custom related to the 2020 protests.

182.    Additionally, in some cases, like Plaintiffs, Defendants enforced other provisions of New York law against Plaintiff and other perceived protesters without probable cause and/or without first having given constitutionally meaningful and adequate dispersal orders and meaningful opportunities to disperse prior to making such arrests.

---

[37] Such a dispersal order would have, of course, been unconstitutional and unlawful — but its absence makes absolutely clear the total lack of even arguable probable cause.

183. In some cases, Defendants employed a crowd control tactic in which Defendants pushed and/or corralled and/or otherwise physically trapped perceived groups including Plaintiff and other perceived protesters, including by kettling, without first having given Plaintiff and the others so pushed and/or corralled and/or trapped meaningful notice and an opportunity to disperse or otherwise change their conduct in order to avoid being so pushed and/or corralled and/or trapped.

**DEFENDANTS' PROTEST ARREST PROCESSING POLICIES AND PRACTICES**

184. Because Defendants arrested Plaintiff and other arrestees in connection with a protest, Defendants subjected them to Defendants' Protest Arrest Processing Policies, which involved, among other components, placing Plaintiff and other arrestees in flex-cuffs or overtight metal cuffs and removing them from the street to a centralized arrest processing location such as a Mass Arrest Processing Center ("MAPC"), where Defendants subject them to large-scale arrest processing procedures and Mass Arrest Processing Plan ("MAPP") rather than issuing them summonses, and releasing them from custody, on the street.

185. Additionally, as a result, instead of detaining Plaintiff and other arrestees for a relatively brief period of time on the street, issuing them summonses, and releasing them, Defendants subjected Plaintiff to overtight metal handcuffing as well as unreasonably lengthy, onerous arrest processing, significantly increasing the amount of time they would otherwise have been in custody and exposing them to inappropriate and especially hazardous conditions of confinement, as well as searches of their persons and property, and/or seizures and/or retentions of their property without adequate pre- or post-deprivation notice and/or opportunity to be heard to challenge the grounds for seizing and/or retaining the property.

186.     In some cases, NYPD members destroyed and/or damaged property belonging to Plaintiff and other arrestees.

187.     In other cases, NYPD members seized and retained property from arrestees without providing them with the NYPD paperwork required by NYPD policies, practices, and procedures to retrieve property seized by NYPD members.

188.     In still other cases, NYPD members seized and retained property without providing arrestees with a meaningful opportunity to retrieve it, for example because the location at which Defendants were retaining the property was closed.

189.     Beyond that, in some cases, Defendants arrested arrestees, including Plaintiff, for alleged offenses which New York Criminal Procedure Law § 150.20 required them to grant Plaintiff summonses on the street in lieu of a fuller or lengthier detention; and/or in connection with which, under the NYPD policies and practices that are applied in non-protest contexts, arrestees are taken directly to a nearby local precinct, and released in an average of between around two and four hours with a C-Summons.

190.     The conditions of Plaintiff's confinement were unsafe and overcrowded, particularly in the context of the COVID-19 pandemic, and/or filthy and/or unsanitary; and lacked appropriate access to phone calls, food, water, bathrooms soap and/or hand sanitizer, other hygienic products such as tampons, and/or other basic necessities.

191.     With particular respect to the COVID-19 pandemic, during Plaintiff's confinements, the State of New York, and Defendant City, had advised people to comply with social distancing, to wear masks, and to engage in practices such as hand-washing; and Defendant City, as well as Defendants Shea, Monahan, and other NYPD members, enforced Executive Orders

issued by Mayor de Blasio requiring people to engage in social distancing and/or mask-wearing, all on an emergency basis.

192. However, as part of Defendants' Protest Arrest Processing Policies and MAPP, instead of detaining Plaintiff and other arrestees for a relatively brief period of time on the street, issuing them summonses, and releasing them, Defendants transported Plaintiff to a MAPC or other centralized arrest processing location, in close, forced proximity to other arrestees and NYPD members, many of whom were not wearing masks, rendering social distancing impossible.

193. Relatedly, many Defendants and other nearby NYPD members were not wearing masks while arresting and/or using force on and/or detaining Plaintiff.

194. Also relatedly, Defendants and other NYPD members removed masks many Plaintiff and other arrestees who had masks at one point prior to or during their arrests or detentions.

195. Also as part of Defendants' Protest Arrest Processing Policies and MAPP, Defendants subjected Plaintiff and other arrestees to conditions of confinement in which they were unable to wash their hands or otherwise engage in other, similar hygienic practices that the State and City were recommending for public health and safety.

196. Defendants knew or should have known that, as a result of subjecting Plaintiff to Defendants' Protest Arrest Processing Policies and MAPP, they would deprive Plaintiff and other arrestees of basic needs, including for example the need to stay safe from COVID-19, as well as unreasonable risks of serious damage to their physical and/or mental health or safety through potential exposure to COVID-19.

197. During Plaintiff's time in NYPD custody, Defendants deprived Plaintiff of meaningful access to food, bathroom, soap and other hygiene products, and other basic necessities

for an extended period of time, and subjected Plaintiff to filthy, crowded, and unsanitary conditions of confinement.

198.    Defendants acted intentionally to impose those conditions because they subjected Plaintiff to Defendants' Protest Arrest Processing Policies and MAPP.

199.    Additionally, Defendants recklessly failed to act with reasonable care to mitigate the risks that the conditions posed even though they knew or should have known that they posed excessive risks to Plaintiff's physical and/or mental health or safety through potential exposure to COVID-19.

200.    Moreover, the risks were obvious and apparent, including based on the State and City policies and practices related to COVID-19 safety, and common sense.

### DEFENDANTS' HISTORICAL FAILURES TO MONITOR AND SUPERVISE NYPD MEMBERS' PROTEST POLICING

201.    Although Defendants City, de Blasio, Shea, Monahan, and other policymakers actually knew, or should have known, that NYPD members were engaging in or had engaged in the unconstitutional conduct complained of herein, they failed to monitor, supervise, and/or discipline NYPD members who directed, engaged in, or observed such conduct.

202.    For example, despite statements made by Defendants de Blasio and Shea in the media indicating they had knowledge of events related to violence and mass arrests at the protests as they were unfolding, and the wealth of video and other evidence that has been widely available in the intervening months, upon information and belief, virtually no NYPD members have been meaningfully investigated or disciplined related to their conduct.

### STATE AND CITY OFFICIAL REPORTS ON THE SUMMER 2020 PROTESTS

203.    In July 2020, the New York State Office of the Attorney General (the "AG") issued a preliminary report on the NYPD's response to the May and June protests ("AG Report").[38]

204.    The AG Report found that most complaints received by the AG were allegations of excessive force, kettling, false arrests, and excessive force against protestors as well as similar misconduct directed at the press, National Lawyers Guild – New York City Chapter Legal Observers, elected officials, and essential workers.

205.    The AG Report also found the pervasive failure of NYPD officers to wear protective face coverings to protect themselves and others against the spread of COVID-19.

206.    In December of 2020, the NYC Department of Investigation issued a report examining the NYPD's conduct in response to the 2020 Black Lives Matter protests ("DOI Report").[39]

207.    The DOI Report found, *inter alia*, that the NYPD lacked a sufficiently tailored strategy to respond to protests, used force and tactics of crowd control that led to excessive force and "heightened tensions," made decisions based on intelligence that lacked "context or proportionality," and deployed officers who lacked sufficient training in responding to protests.[40]

208.    In addition to noting the heavy-handed response by the SRG at the 2020 protests, the DOI Report found that officers not from SRG lacked "any recent training related to protests."[41]

---

[38] New York State Office of the Attorney General, *Preliminary Report on the New York City Police Department's Response to the Demonstrations Following the Death of George Floyd*, ("AG Report"), July 2020, available at https://ag.ny.gov/sites/default/files/2020-nypd-report.pdf. The Plaintiff herein incorporates by reference into this case the facts set forth in the AG Report.
[39] Margaret Garnett, Commissioner, New York City Department of Investigation, *Investigation into NYPD Response to the George Floyd Protests*, ("DOI Report"), Dec. 2020, available at https://www1.nyc.gov/assets/doi/reports/pdf/2020/DOIRpt.NYPD%20Reponse.%20GeorgeFloyd%20Protests.12.18.2020.pdf.
[40] *Id.* at 36.
[41] *Id.* at 61.

209.     The DOI found that NYPD policies do not have specific First Amendment protest expression policing policies and failed to distinguish policies for serious civil disorders and riots from those applicable to peaceful First Amendment expression.

210.     The DOI distinguished between protest facilitation and protest control, regulation, or suppression.

211.     The former is preferred to allow for First Amendment expression, the DOI Report found, but the NYPD employed protest control during the 2020 protests.

212.     According to the DOI Report, between May 28 and June 5, 2020, approximately 2,047 individuals were arrested during demonstrations.[42]

213.     The DOI also found that Black arrestees were disproportionately charged with felonies.[43]

214.     The DOI also found that "the force required to carry out a mass arrest was disproportionate to the identified threat," and "placed the burden of potential crime on a wide swath of people who had no apparent connection to that potential criminal activity."[44]

215.     According to the DOI Report, between May 28 and June 20, 2020, the CCRB had received 1,646 protest-related allegations related to 248 incidents.[45]

216.     Defendant City and NYPD leadership and policymakers knew the department and its officers had problems with constitutionally policing protests but failed to adequately train and otherwise prepare its officers to respond to the 2020 protests, prevent its officers from committing the same acts of misconduct, or discipline officers who engaged in such misconduct.

## FIRST CLAIM FOR RELIEF

---

[42] *Id.* at 26.
[43] *Id.* at 27.
[44] DOI Report at 56.
[45] *Id.* at 28.

42

### Unlawful Seizure / False Arrest

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the Fourth and Fourteenth Amendments to the United States Constitution*

217.    Plaintiff incorporate by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

218.    Defendants' seizure of the Plaintiff herein was done without any judicial warrant authorizing then to seize Plaintiff was unreasonable and was done without privilege or lawful justification.

219.    Plaintiff did not consent and were conscious of their confinements by Defendants.

220.    Defendants did not have individualized probable cause to seize, detain, or arrest Plaintiff.

221.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of their federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

222.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### **SECOND CLAIM FOR RELIEF**

### Excessive Force

*Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the Fourth and Fourteenth Amendments to the United States Constitution*

223.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

224.    Defendants' use of force against Plaintiff was unjustified and objectively unreasonable, taking into consideration the facts and circumstances that confronted Defendants.

225.    As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of their federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

226.    The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### THIRD CLAIM FOR RELIEF

**First Amendment**
***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the First and Fourteenth Amendments to the United States Constitution***

227.    Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

228.    Defendants (a) imposed restrictions on such protected speech and/or conduct that violated Plaintiff's First Amendment rights, including, but not limited to, in falsely arresting Plaintiff, in subjecting Plaintiff to excessive force, in selectively enforcing laws and regulations against Plaintiff, in subjecting Plaintiff to Defendants' Protest Arrest Processing Policies, and in otherwise violating Plaintiff's rights and engaging in the acts and omissions complained of herein.

229.    In addition to being retaliatory, the restrictions Plaintiff complains of herein, which Defendants imposed on Plaintiff's First Amendment rights to participate in, observe, and/or stand nearby speech, conduct, association, and/or other expressive activities protected by the First Amendment on the streets, were themselves regulations on Plaintiff's protected conduct that:

a.   Were viewpoint discriminatory and/or otherwise not content-neutral, and were not necessary, and precisely tailored, to serve compelling governmental interests, and/or were not the least restrictive means readily available to serve those interests; or, alternately,

b.   Were content-neutral, but lacked narrow tailoring to serve a significant governmental interest, in that they burdened substantially more protected speech and/or conduct than necessary to serve those interests, and/or failed to provide ample alternatives for Plaintiff's protected expression, including in that Plaintiff's abilities to communicate effectively were threatened; and/or

c.   Afforded Defendants unbridled or otherwise inappropriately limited discretion to limit or deny Plaintiff's abilities to engage in protected conduct (also raising constitutionally significant Due Process-based vagueness and/or overbreadth concerns); and/or

d.   Amounted to the imposition of strict liability on Plaintiff for engaging in protected speech and/or expression.

230.   As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of their federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

231.   The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### FOURTH CLAIM FOR RELIEF

### First Amendment Retaliation

***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Under the First and Fourteenth Amendments to the United States Constitution***

232.   Defendants retaliated against Plaintiff for engaging in speech and/or conduct protected by the First Amendment.

233.   Defendants engaged in the acts and omissions complained of herein in retaliation for Plaintiff's protected speech, conduct, and/or associations.

234. Defendants engaged in the acts and omissions complained of herein in order to prevent Plaintiff from continuing to engage in such protected speech, conduct, and/or associations.

235. Defendants engaged in the acts and omissions complained of herein in order to prevent and/or discourage Plaintiff from engaging in similar protected conduct and associations in the future.

236. Additionally, as discussed elsewhere herein, Defendant City designed and/or implemented policies and practices pursuant to which those Defendants who implemented them subjected Plaintiff to violations of their First Amendment rights.

237. Upon information and belief, Defendants engaged in the acts and omissions complained of herein with respect to Plaintiff's First Amendment-based claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—with malice.

238. Upon information and belief, Defendants engaged in the acts and omissions complained of herein with respect to Plaintiff's First Amendment retaliation claims—including the related municipal liability claims involving the adoption of policies, practices, and/or customs and/or related failures to train, supervise, and/or discipline—in response to the perceived viewpoint and/or message expressed by Plaintiff.

239. Upon information and belief, Defendants did not subject other protesters expressing "Blue Lives Matter" or other, similar, pro-police messages who were similarly situated to Plaintiff in terms of their conduct and/or its potential public ramifications to the conduct, policies, practices, and/or customs complained of herein.

240.     Additionally, some of the offenses charged against Plaintiff, which Defendants might argue provided probable cause for Plaintiff's' arrest, were offenses that Defendants typically exercise their discretion not to enforce, or not to make arrests in connection with.

241.     Plaintiff suffered actual chill, including in that Plaintiff was prevented and/or deterred from or impeded in participating in protected conduct on the date of and after the incident; and/or suffered adverse effects on their protected speech and/or conduct; and/or otherwise suffered some concrete harm(s).

242.     Additionally, in many cases, Defendants apparently permitted, acquiesced in, and/or facilitated the speech and/or other expressive conduct in which Plaintiff was engaging, before suddenly using force and/or making arrests, without first having given reasonable notice that such force and/or arrest activity would result if Plaintiff did not conduct themselves differently and/or disperse, as well as a meaningful opportunity to comply.

243.     Additionally, as discussed elsewhere herein, Defendant City designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in arresting and detaining Plaintiff subjected Plaintiff to the violations of their First Amendment rights described elsewhere herein.

244.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of their federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

245.     The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## FIFTH CLAIM FOR RELIEF

**Due Process**

***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Protected Under the Fifth and Fourteenth Amendments to the United States Constitution***

246. Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

247. As described above, Defendants enforced offenses in a manner that rendered them constitutionally void for vagueness and/or overbroad, such that their enforcement against Plaintiff violated their Due Process rights, in that Defendants' enforcement in connection with those offenses failed to provide and/or reflected the absence of adequately clear standards to guide police officials' extremely broad discretion to arrest anyone at their whim, based on *ad hoc* determinations, often without fair warning.

248. Additionally, as discussed elsewhere herein, Defendants City, de Blasio, Shea, and/or Monahan designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in seizing and/or retaining Plaintiff's property and/or detaining Plaintiff in the conditions as described subjected Plaintiff to the violations of their Due Process rights described elsewhere herein.

249. As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of their federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

250. The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## <u>SIXTH CLAIM FOR RELIEF</u>

**Equal Protection and Selective Enforcement**

***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Protected
Under the Fourteenth Amendment to the United States Constitution***

251.     Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

252.     As described above, in many cases, Defendants arrested Plaintiff for alleged offenses in connection with which C.P.L. § 150.20 required that Plaintiff receive summonses on the street in lieu of a fuller or lengthier detention; and/or in connection with which, under the NYPD policies and practices that are applied in non-protest contexts, arrestees are taken directly to a nearby local precinct, and released in an average of between around two and four hours with a summons.

253.     However, because Defendants arrested Plaintiff and other arrestees in connection with a protest, Defendants subjected them to Defendants' Protest Arrest Processing Policies, rather than issuing them summonses, and releasing them from custody, on the street, while Defendants did not apply those same Protest Arrest Processing Policies to other similarly situated arrestees.

254.     Additionally, as discussed elsewhere herein, Defendants City, de Blasio, Shea, and/or Monahan designed and/or implemented policies and practices pursuant to which those Defendants who ordered, effected, and otherwise participated in arresting and/or detaining and/or prosecuting Plaintiff subjected Plaintiff to the above-described violations of Plaintiff's Equal Protection rights.

255.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of their federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

256. The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SEVENTH CLAIM FOR RELIEF

### Deprivation of Fair Trial Rights

***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Protected Under the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution***

257. Plaintiff incorporates by reference the allegations set forth in all preceding and subsequent paragraphs as if fully set forth herein.

258. Defendants fabricated evidence of a material nature, likely to influence a jury's decision, intentionally forwarded that evidence to prosecutors, as a result of which Plaintiff suffered liberty deprivations and other injuries.

259. As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of their federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

260. The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## EIGHTH CLAIM FOR RELIEF

### Malicious Prosecution

***Pursuant to 42 U.S.C. § 1983 for Defendants' Violations of Plaintiff's Rights Protected Under the Fourth and Fourteenth Amendments to the United States Constitution***

261. Plaintiff incorporates by reference the allegations set forth in all preceding and subsequent paragraphs as if fully set forth herein.

262. Upon information and belief, Defendants misrepresented and falsified evidence to the prosecutor and/or failed to make a full statement of the relevant evidence – including potentially exculpatory evidence - to the prosecutor.

263. Defendants were directly and actively involved in the initiation or prosecution of criminal proceedings against Plaintiff, including by supplying and creating false information to be included in NYPD paperwork that was included in NYPD paperwork, providing falsely sworn information in accusatory instruments, and/or providing false information to the prosecutor.

264. Defendants lacked probable cause to initiate and continue criminal proceedings against Plaintiff.

265. Defendants acted with malice in initiating criminal proceedings against Plaintiff.

266. Notwithstanding Defendants' misconduct, the criminal proceedings against Plaintiff were favorably terminated on the merits.

267. As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of their federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

268. The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## **NINTH CLAIM FOR RELIEF**

## Municipal Liability

### Pursuant to 42 U.S.C. 1983 and Monell v. Department of Social Services, 436 U.S. 658 (1978) for Defendants' Violations of Plaintiff's Rights Under the First, Fourth, and Fourteenth Amendments to the United States Constitution

269.    Plaintiff hereby incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

270.    The facts pleaded above describe the policies, practices, and customs Defendants subjected protesters and essential workers across New York City (including Plaintiff) to, including, but not limited to: uses of excessive force, and false arrests, and unreasonable restrictions on protesters' First Amendment-protected conduct, often without fair warning; employing crowd control tactics such as pushing, corralling, encircling, or otherwise trapping protesters, without fair warning; engaging in retaliatory and selective enforcement of the criminal laws against perceived participants in First Amendment assemblies, particularly Black Lives Matter and/or anti-police brutality protests, in the absence of adequately clear standards to guide police officials' extremely broad discretion to arrest anyone at their whim, based on *ad hoc* determinations as to their perceived violations, without fair warning; using flex-cuffs or overtight metal cuffs for protest-related arrests, while failing to supply officers with protective padding and adequate numbers of cutting tools to loosen or remove flex-cuffs, and/or to ensure that such cutting tools are readily available when needed; failing to loosen or remove over-tight cuffs; and subjecting arrestees to lengthy detentions and lengthy detentions and arrest processing at centralized arrest processing locations, exposing them to searches, property seizures, and unhealthy and conditions of confinement, in lieu of brief street detentions.

271. That set of policies and practices added up to an atmosphere of total lawlessness among the NYPD: open season was declared on anti-police protesters and anyone — like Plaintiff — who dared to associate with them.

272. As set out above, Defendants arrested Plaintiff entirely without probable cause, while acting—to the extent they did not know—to deliberately and willfully blind themselves to the obvious fact that Plaintiff was an essential worker and allowed to provide essential, jail services.

273. The Defendant City's policies — particularly as reflected in the second FINEST message that glossed over the notice-to-disperse requirement—were designed to encourage, and trained officers to engage in, such willful blindness.

274. Upon information and belief, either the Defendant City or the Defendant high-level NYPD decisionmakers made a choice not to convey the Mayor's clear and unambiguous guidance that jail support members were essential workers.

275. The total lawless atmosphere fostered by Defendant City's policies and practices as set out above sent the message to individual officers that they should feel free to make illegal arrests, like the arrest of Plaintiff, as long as it was connected to anti-police protesting.

276. All of the wrongful acts or omissions complained of herein were carried out by the individual named and unnamed police officer defendants pursuant to: (a) formal policies, rules, and procedures of Defendant City; (b) actions and decisions by Defendant City's policymaking agents including, but not limited to, Defendant de Blasio, Defendant Shea, and Defendant Monahan; (c) customs, practices, and usage of the NYPD that are so widespread and pervasive as to constitute *de facto* policies accepted, encouraged, condoned, ratified, sanctioned, and/or enforced by Defendant City, Defendant de Blasio, Defendant Shea, Defendant Monahan, and other

policymaking officials; (d) Defendant City's deliberate indifference to Plaintiff's rights secured by the First, Fourth, and Fourteenth Amendments of the United States Constitution, as evidenced by the City's failures, and the failures of the City's policymaking agents, to train, supervise, and discipline NYPD officers, despite full knowledge of the officers' wrongful acts, as described herein.

## TENTH CLAIM FOR RELIEF

### Violations of New York State Law

***Pursuant to the New York State Constitution and New York State Common Law***

277.     Plaintiff incorporates by reference the allegations set forth in all preceding and following paragraphs as if fully set forth herein.

278.     The conduct of the police officials alleged herein occurred while they were on duty and/or in and during the course and scope of their duties and functions as police officials, and/or while they were acting as agents and employees of Defendant City, clothed with and/or invoking state power and/or authority, and, as a result, Defendant City is liable to the Plaintiff pursuant to the state common law doctrine of *respondeat superior*.

### Violations of the New York State Constitution

279.     Defendants, acting under color of law, violated Plaintiff's rights pursuant to Article I, §§ 6, 8, 9, 11, and 12 of the New York State Constitution.

280.     A damages remedy here is necessary to effectuate the purposes of Article I, §§ 6, 8, 9, 11, and 12 of the New York State Constitution, and appropriate to ensure full realizations of Plaintiff's rights under those sections.

### Assault

281.     Defendants committed assault within the meaning of New York common law against Plaintiff by intentionally placing Plaintiff in fear of imminent harmful or offensive contact.

**Battery**

282.     Defendants committed battery within the meaning of New York common law against Plaintiff by intentionally physically contacting Plaintiff without Plaintiff's consent.

**Conversion**

283.     Defendants committed conversion by intentionally taking possession of and/or interfering with Plaintiff's personal property in derogation of Plaintiff's rights.

**False Imprisonment and Unreasonable Detention**

284.     By the actions described above, the police officials described above did falsely arrest and/or imprison Plaintiff within the meaning of New York common law without reasonable or probable cause, illegally and without a written warrant, and without any right or authority to do so. Plaintiff was conscious of the confinement and it was without her consent.

**Negligent Training and Supervision**

285.     Upon information and belief, Defendant City supervised, and trained the police officials described above.

**Excessive Detention**

286.     Defendants deliberately detained Plaintiff for excessive and unreasonably prolonged periods of time.

**Malicious Prosecution**

287.     Defendants commenced criminal proceedings against Plaintiff maliciously and without probable cause.

288.     All charges were terminated in Plaintiff's favor.

289.     As a result of Defendants' acts and omissions, Defendants deprived Plaintiff of their federal, state, and/or other legal rights; caused Plaintiff bodily injury, pain, suffering, psychological and/or emotional injury, and/or humiliation; caused Plaintiff to expend costs and expenses; and/or otherwise damaged and injured Plaintiff.

290.     The unlawful conduct of the Defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## DEMAND FOR A JURY TRIAL

Plaintiff hereby demands a jury trial of all issues capable of being determined by a jury.

## DEMAND FOR JUDGMENT

WHEREFORE, Plaintiff demands judgment against the individual Defendants and the City of New York as follows:

i.     Actual and punitive damages against the individual Defendants in an amount to be determined at trial;

ii.     Actual damages in an amount to be determined at trial against the City of New York;

iii.     Statutory attorney's fees, disbursements, and costs of the action pursuant to, *inter alia,* 42 U.S.C. §1988 and New York common law; and

iv.     Such other relief as the Court deems just and proper.

Dated: New York, New York
       May 12, 2022

**GIDEON ORION OLIVER**

277 Broadway, Suite 1501
New York, NY  10007
t: 718-783-3682
f: 646-349-2914
Gideon@GideonLaw.com


**COHEN&GREEN P.L.L.C.**


By: _____
Elena L. Cohen
J. Remy Green
Jessica Massimi

1639 Centre Street, Suite 216
Ridgewood (Queens), NY 11385
    t: (929) 888-9480
    f: (929) 888-9457
    e: elena@femmelaw.com
       remy@femmelaw.com
       jessica@femmelaw.com

57